1  Melissa A. Fortunato (SBN 319767)
      fortunato@bespc.com
2  Marion C. Passmore (SBN 228474)
      passmore@bespc.com
3  BRAGAR EAGEL & SQUIRE, P.C.
   445 S. Figueroa Street, Suite 3100
4  Los Angeles, CA 90071
   Telephone: (213) 612-7735
5  Facsimile: (212) 214-0506

6  *Attorney for Plaintiffs*

7
                 **UNITED STATES DISTRICT COURT**
8                **CENTRAL DISTRICT OF CALIFORNIA**

9

10  AUDREY McADAMS, derivatively on
    behalf of THE WALT DISNEY                    Case No.:
11  COMPANY,
                                                 **VERIFIED SHAREHOLDER**
12              Plaintiff,                        **DERIVATIVE COMPLAINT**

13       v.                                       **JURY TRIAL DEMANDED**
14

15  SUSAN E. ARNOLD, MARY T.
    BARRA, SAFRA A. CATZ, AMY L.
16  CHANG, ROBERT A. CHAPEK,
    KAREEM DANIEL, FRANCIS A.
17  DESOUZA, MICHAEL B.G. FROMAN,
    ROBERT A. IGER, MARIA ELENA
18  LAGOMASINO, CHRISTINE M.
    MCCARTHY, CALVIN R.
19  MCCARTHY, CALVIN R.
    MCDONALD, MARK G. PARKER, and
20  DERICA W. RICE,
21
                Defendants,
22
         and
23
24  THE WALT DISNEY COMPANY,
25              Nominal Defendant.
26

27

28

                  VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**INTRODUCTION**

Plaintiff Audrey McAdams ("Plaintiff"), by and through her counsel, derivatively on behalf of Nominal Defendant The Walt Disney Company ("Disney" or the "Company"), submits this Verified Shareholder Derivative Complaint against Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Disney with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Disney; (iii) a securities class action against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading between December 10, 2020 and November 8, 2022 (the "Relevant Period") with respect to Disney's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning Disney.

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action asserted on behalf of Nominal Defendant Disney against certain current and former officers and members of the Board for breaches of fiduciary duties and to recover damages caused to the Company as described herein.

2.     Disney was founded in 1923. The Company, among other things, focuses on film and episodic television content production and distribution, operates television networks, and runs studios that produce films. The Company also offers direct to consumer ("D2C") services through its Disney+, Disney+ Hotstar, ESPN+, Hulu, and Star+ streaming platforms. In addition, the Company operates theme parks and resorts,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Disney Cruise Line, Disney Vacation Club, National Geographic Expeditions, Adventures by Disney, and Aulani, a Disney resort and spa in Hawaii.

3. During the Relevant Period, the Individual Defendants (defined below) repeatedly misled investors about the success of the Disney+ platform by concealing the true costs of the platform, concealing the expense and difficulty of maintaining robust Disney+ subscriber growth, and claiming that the platform was on track to achieve profitability and 230 to 260 million paid global subscribers by the end of fiscal year 2024.

4. The Individual Defendants made these representations notwithstanding the fact that initial subscriber numbers for Disney+ had been boosted temporarily and unsustainably by a low launch price of $6.99 per month, a bevy of additional short term, low-cost promotions, and a near-captive audience of consumers who were homebound due to COVID-19 restrictions. As a result, the consumers most likely to subscribe to Disney+ had already done so by the start of the Relevant Period.

5. In addition, Disney was suffering staggering costs in creating the content needed to attract such a large number of subscribers in the highly competitive streaming wars that were then raging among Disney's many competitors such as Netflix, Apple TV+, Amazon Prime, Paramount+, HBO Max, YouTube, and Peacock. In truth, during the Relevant Period, Disney+ was never on track to achieve the 2024 profitability and subscriber figures provided to investors and such estimates lacked a reasonable basis in fact.

6. To conceal these adverse facts, the Individual Defendants engaged in a fraudulent scheme designed to hide the extent of Disney+ losses and to make the growth trajectory of Disney+ subscribers appear sustainable and 2024 Disney+ targets appear achievable when they were not. Specifically, the Individual Defendants used the newly created Disney Media and Entertainment Distribution ("M&ED") division to inappropriately shift costs out of the Disney+ platform and onto legacy platforms.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

M&ED, under the direction of Defendants Robert A. Chapek "(Chapek") and Kareem Daniel ("Daniel") and with the knowledge of Christine M. McCarthy ("McCarthy"), debuted content created for Disney+ initially on a legacy platform to shift marketing and production costs onto that platform. Under the newly reorganized Company, the initial costs of marketing campaigns were generally recognized in the M&ED distribution platform of initial exploitation, with allocation of programming and production costs driven by distribution of the relevant content across windows. As part of a scheme to make Disney+'s financial performance appear more successful than it was, the Individual Defendants caused the Company to air certain shows that were supposed to be Disney+ originals – such as the mystery show *The Mysterious Benedict Society* and the medical drama *Doogie Kameāloha, M.D.* – first on legacy television networks such as the Disney Channel. By doing so, a significant portion of the marketing and production costs of the shows were shifted away from Disney+ and on to the legacy platforms. Despite this cost-shifting scheme, the Individual Defendants repeatedly represented during the Relevant Period that platform distribution decisions were made based on different reasons, such as customer preferences and what was best for the business commercially.

7.    Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (i) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (ii) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (iii) M&ED's motive to conceal the complete costs of constructing Disney+'s content library led them to make

platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (iv) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis and, as such, Disney was not on track to achieve these targets; and (v) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

8.     As a direct and proximate result of the misconduct described herein by the Individual Defendants, Disney has sustained significant damages as described below.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b), 14(a), and 21D of the Securities Exchange Act of 1934 ("Exchange Act"). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over Nominal Defendant Disney because it is authorized to do business in this state and has consented to service in this state.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains offices in this District; a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and violation

of fiduciary duties owed to Disney occurred in this District; and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

12.     Plaintiff is a shareholder of Disney.  She was a shareholder at the time of the wrongdoing and has continuously held stock in the Company at all times relevant to the wrongdoing by Defendants alleged herein.

13.     Nominal Defendant Disney is incorporated under the laws of Delaware, and its principal executive offices are located at 500 South Buena Vista Street, Burbank, California, 91521. Disney's common stock trades on the Nasdaq Stock Exchange under the symbol "DIS."

14.     Defendant Susan E. Arnold ("Arnold") served as a member of the Board from 2007 to April 3, 2023, and as Chairman of the Board from December 31, 2021 to April 3, 2023.  Defendant Arnold also served as Chair of the Nominating and Governance Committee (the "Governance Committee").

15.     Defendant Mary T. Barra ("Barra") has been a member of the Board since 2017. She has served as a member of the Compensation Committee since 2018.

16.     Defendant Safra A. Catz ("Catz") has been a member of the Board since 2018 and has served as a member of the Audit Committee since 2019, sitting as its Chair from 2020 to April 3, 2023.

17.     Defendant Amy L. Chang ("Chang") has been a member of the Board since May 27, 2021, and has served as a member of the Governance Committee since May 2021.

18.     Defendant Chapek served as the Company's Chief Executive Officer ("CEO"), member of the Board, and a member of the Executive Committee from February 2020 until his termination on November 20, 2022. Prior to his termination, Defendant Chapek spent almost thirty years working for the Company, holding

various positions between 1993 and 2022. According to the Company's public filings, for the 2022 fiscal year, Defendant Chapek received $24,183,003 in total compensation from the Company. This included $2,500,000 in salary, $10,810,832 in stock awards, $3,750,020 in option awards, $6,750,000 in non-equity incentive plan compensation, and $372,151 in all other compensation. For the 2021 fiscal year, Defendant Chapek received $32,464,293 in total compensation from the Company. This included $2,500,000 in salary, $10,215,466 in stock awards, $3,750,012 in option awards, $14,330,000 in non-equity incentive plan compensation, $1,358,505 in change in pension value and non-qualified deferred compensation earnings, and $310,310 in all other compensation.

19.    Defendant Daniel was a long-time employee of Disney that served as President, Consumer Products, Games and Publishing, and Chief of Staff to the CEO during Defendant Chapek's tenure as CEO. Prior to his dismissal from Disney on November 21, 2022, Defendant Daniel served as the first and only Chairman of Disney's M&ED segment which was "responsible for driving the overall growth and profitability of The Walt Disney Company's global media businesses and delivering its unparalleled storytelling to fans and families around the world."

20.    Defendant Francis A. deSouza ("deSouza") has been a member of the Board since 2018 and has served as a member of the Audit Committee since 2019.

21.    Defendant Michael B.G. Froman ("Froman") has been a member of the Board since 2018. Froman served as a member of the Audit Committee from 2019 to 2020 and as a member of the Governance Committee since 2021.

22.    Defendant Robert A. Iger ("Iger") has served as the Company's CEO since November 2022. Previously, Iger served as the Company's CEO from 2005 to 2020. Defendant Iger also served as Chairman of the Board from March 2012 through December 2021 and Executive Chairman from 2020 to December 31, 2021.  For the 2022 fiscal year, Defendant Iger received $14,998,299 in total compensation

comprised of $1,096,154 in salary, $4,670,521 in stock awards, $2,395,104 in option awards, $4,370,000 in on-equity incentive plan compensation, and $2,466,520 in all other compensation. For the 2021 fiscal year, Defendant Iger received $45,899,796 million in total compensation comprised of $3 million in salary, $9,293,921 in option awards, $22,920,000 in non-equity incentive plan compensation, and $1,205,996 in all other compensation.

23.     Defendant Maria Elena Lagomasino ("Lagomasino") has been a member of the Board since 2015. Lagomasino has served as a member of the Governance Committee since at least 2020. Defendant Lagomasino has also served as a member of the Compensation Committee since 2016, sitting as its Chair since 2020.

24.     Defendant McCarthy served as the Company's Chief Financial Officer ("CFO") from 2015 until her resignation in June 2023. Prior to her resignation, Defendant McCarthy held various positions working for the Company for 23 years. For the 2022 fiscal year, Defendant McCarthy received $20,235,669 in total compensation. This included $1,980,000 in salary, $8,935,794 in stock awards, $3,375,042 in option awards, $5,820,000 in non-equity incentive plan compensation, and $124,833 in all other compensation. For the 2021 fiscal year, Defendant McCarthy received $21,729,215 in total compensation. This included $1,903,754 in salary, $6,922,854 in stock awards, $5,000,015 in option awards, $7,680,000 in non-equity incentive plan compensation, $103,152 in change in pension value and non-qualified deferred compensation earnings, and $119,440 in all other compensation.

25.     Defendant Calvin R. McDonald ("McDonald") has been a member of the Board since 2021 and has served as a member of the Compensation Committee since 2022.

26.     Defendant Mark G. Parker ("Parker") has been a member of the Board since 2016, sitting as Chair since 2023. Defendant Parker served as a member of the

Governance Committee from 2018 to 2021 and as a member of the Compensation Committee since 2020.

27. Defendant Derica W. Rice ("Rice") has been a member of the Board since 2019. Defendant Rice has served as a member of the Audit Committee since 2022, sitting as Chair since 2023. She also served as a member of the Governance Committee from 2020 to 2021.

28. The following defendants are collectively referenced herein as the "Individual Defendants:" Arnold, Barra, Catz, Chang, Chapek, Daniel, deSouza, Froman, Iger, Lagomasino, McCarthy, McDonald, Parker, and Rice.

29. The following Individual Defendants are collectively referenced herein as the "Director Defendants:" Arnold, Barra, Catz, Chang, deSouza, Froman, Iger, Lagomasino, McDonald, Parker, and Rice.

30. The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants:" Catz, deSouza, and Rice.

31. The following Individual Defendants are collectively referenced herein as the "Governance Committee Defendants:" Arnold, Chang, Froman, Lagomasino, and Parker.

32. The following Individual Defendants are collectively referenced herein as the "Compensation Committee Defendants:" Barra, Lagomasino, McDonald, and Parker.

33. The following Individual Defendants are collectively referenced herein as the "Insider Selling Defendants:" Chapek and McCarthy.

34. The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants:" Chapek, Daniel, and McCarthy.

35. The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY
DUTIES TO THE COMPANY AND ITS SHAREHOLDERS**

36.   At all relevant times, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its shareholders, the members of the public who had invested in Disney.

37.   Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

38.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

39.   Each of the Company's directors owes to the Company and its shareholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

40.   Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

41.   To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers, and directors of Disney were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

42.     The Individual Defendants knowingly violated their obligations as directors and/or officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its shareholders despite their knowledge of the risk of serious injury to the Company.

43.     Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Disney.

**Disney's Code of Ethics and Corporate Governance**

44.     Disney has adopted a Code of Business Conduct and Ethics for Directors (the "Code"), which states that the Board "promotes ethical behavior" and that every

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

director must "represent the interests of the shareholders of The Walt Disney Company." It further states that the Code is "mandatory and applies to all Directors, who are accountable for compliance with the Code."

45.     In the section titled "Conflicts of Interest" the Code states:

> Directors must avoid conflicts of interest. A conflict of interest occurs when an individual's private interest interferes in any way with the interests of the company or any of its subsidiary and affiliated companies (collectively, the "Company"). A conflict of interest may also arise when a Director, or a member of his or her immediate family[], receives improper personal benefits as a result of his or her position in the Company. Directors should also be mindful of, and seek to avoid, conduct which could reasonably be construed as creating an appearance of a conflict of interest.

46.     In the section titled "Use of Corporate Information, Opportunities and Assets" the Code states:

> Directors may not compete with the Company, or use opportunities that are discovered through the use of Company property, Company information or position, for their personal benefit or the benefit of persons or entities outside the Company. No Director may improperly use or waste any Company asset.

47.     In the section titled "Confidentiality" the Code states that "no Director shall use Confidential Information for his or her own personal benefit." "Confidential Information" is defined in part as "all non-public information entrusted to or obtained by a Director by reason of his or her position as a Director of the Company."

**Disney's Corporate Governance Guidelines**

48.    The Board has also adopted Corporate Governance Guidelines (the "Guidelines") which state that: "Each Director shall at all times represent the interests of the shareholders of the Company."

49.    In the section titled "Functions of the Board of Directors" the Guidelines state that it is the "responsibility of the Board [] to supervise and direct management of the Company in the interest of and for the benefit of the Company's shareholders."

50.    In the section titled "Board Conduct and Review" the Guidelines state:

> Members of the Board shall act at all times in accordance with the requirements of the Company's Code of Business Conduct and Ethics for Directors. This obligation shall at all times include, without limitation, strict adherence to the Company's policies with respect to conflicts of interest, confidentiality, protection of the Company's assets, ethical conduct in all business dealings and respect for and compliance with applicable law.

**The Audit Committee Charter**

51.    The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Catz, deSouza, and Rice during the Relevant Period. The Audit Charter states:

> The responsibilities of the Board of Directors (the "Board") of The Walt Disney Company (the "Company") include oversight of the Company's systems of internal control, preparation and presentation of financial reports and compliance with applicable laws, regulations and Company policies. Through this Charter, the Board delegates certain responsibilities to the Audit Committee (the "Committee") to assist the

1   Board in the fulfillment of its duties to the Company and its
2   shareholders.

3   52.   The Audit Charter specifically states that the "Committee shall be given
4   the resources and assistance necessary to discharge its responsibilities, including
5   appropriate funding" and "unrestricted access to Company personnel and documents
6   and the Company's independent auditors."

7   53.   Pursuant to the Audit Charter, the overarching duties of oversight that the
8   Audit Committee is tasked with include oversight of "the integrity of the Company's
9   financial statements," "the adequacy of the Company's system of internal controls,"
10  the "Company's compliance with legal and regulatory requirements," and "to prepare
11  the audit committee report as required by the Securities and Exchange Commission []
12  to be included in the Company's annual proxy statement."

13  54.   The Audit Charter includes the following responsibilities of its members:

14  • **Financial Reporting.** The Audit Committee shall monitor
15     the preparation by management of the Company's
16     quarterly and annual external financial reports. In carrying
17     out this responsibility, the Audit Committee shall:

18     o Review with management the significant financial
19        reporting issues, judgments and estimates used in
20        developing the financial reports, including analyses of
21        the effects of alternative GAAP methods on the
22        financial statements.

23     o Review the accounting and reporting treatment of
24        significant transactions outside the Company's
25        ordinary operations.

26     o Review with management and the Company's
27        independent auditors significant changes to the

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's accounting principles or their application as reflected in the financial reports.

o Review with management and the Company's independent auditors the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

o Meet periodically with the Company's independent auditors (in private, as appropriate) (a) to review their reasoning in accepting or questioning significant decisions made by management in preparing the financial reports; (b) to review any audit problems or difficulties and management's response; (c) to review any outstanding disagreements with management that would cause them to issue a non-standard report on the Company's financial statements; (d) to examine the appropriateness of the Company's accounting principles (including the quality, not just the acceptability, of accounting principles) and the clarity of disclosure practices used or proposed; (e) to determine if any restrict ions have been placed by management on the scope of their audit; and (f) to discuss any other matters the Committee deems appropriate.

o Review earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others, and discuss their

appropriateness with management and the Company's independent auditors, paying particular attention to any use of "proforma" or "adjusted" non-GAAP information.

o Review draft quarterly and annual financial statements and discuss their appropriateness with management and the Company's independent auditors, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board ("PCAOB") and the SEC.

o Consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

• **Internal Control.** The Audit Committee shall have responsibility for overseeing that management has implemented an effective system of internal control that helps promote the reliability of financial and operating information and compliance with applicable laws, regulations and Company policies, including those related to risk management, ethics and conflicts of interest. In carrying out this responsibility, the Audit Committee shall:

o Inquire of management, management auditors and the Company's independent auditors concerning any deficiencies in the Company's policies and procedures that could adversely affect the adequacy of internal controls and the financial reporting process and review any special audit steps adopted in light of any material control deficiencies and the timeliness and reasonableness of proposed corrective actions.

o Review significant management audit findings and recommendations, and management's responses thereto.

o Meet periodically with management auditors in private session (without the participation of management or the independent auditors).

o Review the Company's policies and practices with respect to risk assessment and risk management.

o Review the Company's policies and practices related to compliance with laws, ethical conduct and conflicts of interest.

o Review significant cases of conflicts of interest, misconduct or fraud.

o Review significant issues between the Company and regulatory agencies.

**The Nominating and Corporate Governance Charter**

55.  The Nominating and Governance Committee Charter (the "Governance Charter") imposes additional duties and responsibilities on the members of the Governance Committee, which included Arnold, Chang, Froman, Lagomasino, and

Parker during the Relevant Period. Among the duties imposed by the Governance Charter is to "[m]onitor the implementation and operation of the Company's Corporate Governance Guidelines." This includes reviewing "from time to time, as the Committee deems appropriate, the adequacy of the Corporate Governance Guidelines in light of broadly accepted practices of corporate governance, emerging governance issues and market and regulatory expectations, and to advise and make recommendations to the Board with respect to appropriate modifications."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company**

56.    Disney was founded in 1923 by Walt and Roy Disney. What began with the sale of a live-action black and white silent film called *Alice's Wonderland* has become the world's largest entertainment group. The Company, together with its subsidiaries, engages in the film and episodic television content production and distribution business; operates television networks under the ABC, Disney, ESPN, Freeform, FX, Fox, National Geographic, and Star brands; and runs studios that produce films under the Walt Disney Pictures, 20th Century Studios, Marvel, Lucasfilm, Pixar, and Searchlight Pictures banners. Disney also offers D2C streaming services including Disney+, Disney+ Hotstar, ESPN+, Hulu, and Star+.

57.    The Company sells and licenses film and television content to third-party television and subscription video-on-demand services; operates theatrical, home entertainment, and music distribution services; stages and licenses live entertainment events; and offers post-production services by Industrial Light & Magic and Skywalker Sound.

58.    Disney also licenses its intellectual property to a third party who owns and operates the Tokyo Disney Resort; offers consumer products, including by the licensing of trade names, characters, visual, literary, and other IP for use on merchandise, published materials, and games; operates a direct-to-home satellite

distribution platform; sells branded merchandise through retail, online, and wholesale businesses; and develops and publishes books, comic books, and magazines.

59.    In addition, the Company operates theme parks and resorts (such as Walt Disney World Resort in Florida, Disneyland Resort in California, Disneyland Paris, Hong Kong Disneyland Resort, and Shanghai Disney Resort), Disney Cruise Line, Disney Vacation Club, National Geographic Expeditions, Adventures by Disney, and Aulani, a Disney resort and spa in Hawaii.

**Defendant Chapek Replaces Defendant Iger as Disney's CEO**

60.    In February 2020, Disney announced that after a 15-year career at the Company, Defendant Iger would step down as CEO and be replaced by Defendant Chapek, who had worked under Defendant Iger for over ten years. Defendant Iger assumed the role of Executive Chairman until December 31, 2021, so that he could continue to direct the Company's creative endeavors and lead the Board.

61.    In March 2020, just one month after Defendant Chapek took the reins, COVID-19 became a pandemic and, in an attempt to contain the spread, many countries enacted lockdowns, which negatively affected Disney's businesses.

62.    Disney was forced to shutter its theme parks, resorts, and cruise lines, completely pause movie distribution and productions, and its live programming television networks were halted, primarily, because sporting events were cancelled. As a result, in May 2020, Disney announced that it was suspending its dividends. In August 2020, the Company reported its first quarterly loss in 19 years. In November 2020, Disney reported its first annual loss in over 40 years.

63.    Although most of Disney's businesses suffered in the wake of the COVID-19 pandemic, subscriptions to the Company's new streaming service, Disney+, substantially increased.

64.    Disney+ was launched in the United States in November 2019. Disney initially provided a guidance that by the end of its fiscal year 2024, Disney+ would

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

have between 60 million to 90 million paid subscribers. However, because of the COVID-19 lockdowns and people staying at home, like many other streaming services, Disney+'s paid subscribers increased dramatically. By April 2020 Disney+ had over 50 million, and by November 2020 almost 74 million paid subscribers. Defendant Chapek attempted to seize on this opportunity with a complete reorganization of the Company.

65.    Disney had been organized into four reporting segments: (i) Media Networks; (ii) Parks, Experiences and Products; (iii) Studio Entertainment; and (iv) Direct-to-Consumer & International. However, in October 2020, the Company announced a strategic reorganization of its media and entertainment businesses, which was intended to further accelerate the Company's D2C strategy.

66.    As Defendant Chapek explained in an interview on *CNBC*, the reorganization was intended to "accelerate our transition to a real direct-to-consumer priority company." He continued: "We believe that we've got the opportunity to build upon the success of Disney+, which by almost any measure has been far and above anybody's expectations and really use this to catalyze our growth and increase shareholder wealth."

67.    The October 12, 2020 press release announcing the restructure characterized the pivot as being based on the success of Disney+ and stated, in relevant part:

> Under the new structure, Disney's world-class creative engines will focus on developing and producing original content for the Company's streaming services, as well as for legacy platforms, while distribution and commercialization activities will be centralized into a single, global Media and Entertainment Distribution organization. The new Media and Entertainment Distribution group will be responsible for all monetization of content—both distribution and ad sales—and will oversee operations

of the Company's streaming services. It will also have sole P&L accountability for Disney's media and entertainment businesses.

\*    \*    \*

"Given the incredible success of Disney+ and our plans to accelerate our direct-to-consumer business, we are strategically positioning our Company to more effectively support our growth strategy and increase shareholder value," Mr. Chapek said. "Managing content creation distinct from distribution will allow us to be more effective and nimble in making the content consumers want most, delivered in the way they prefer to consume it. Our creative teams will concentrate on what they do best—making world-class, franchise-based content—while our newly centralized global distribution team will focus on delivering and monetizing that content in the most optimal way across all platforms, including Disney+, Hulu, ESPN+ and the coming Star international streaming service."

68.    The reorganization resulted in only two reporting segments: (i) M&ED; and (ii) Disney Parks, Experiences and Products. This was a dramatic departure from Disney's historical reporting structure and was hugely controversial within the Company because it took power away from creative content-focused executives and centralized it in the new M&ED reporting group led by Defendant Daniel who reported directly to Defendant Chapek, his long-time mentor.

69.    After the reorganization, the distribution and commercialization activities of the Company's media and entertainment operations were centralized into M&ED. Disney M&ED's operating results were reported throughout three distribution lines of business: (i) D2C; (ii) Linear Networks (*i.e.*, cable and broadcast television networks); and (iii) Content Sales/Licensing (primarily comprising

theatrical, home entertainment, and third-party television and subscription video-on-demand distribution globally).

70.     Defendant Chapek removed budgetary and distribution control from the heads of Disney's content groups and placed control in the hands of Defendant Daniel. Defendant Daniel oversaw the profit and loss management, distribution, operations, sales, advertising, data, and technology functions for all of the Company's content worldwide.

71.     In this way, Disney M&ED became responsible for the monetization of all Disney content globally – both distribution and advertising sales – and oversaw the operations of the Company's streaming services. Disney M&ED was responsible for determining which platform the Company's content would be released on, whether it be a streaming service, a television network, or traditional movie theaters.

72.     With this new structure, Defendants Chapek and Daniel had almost complete control over the Company's strategic decisions around content.

**Defendants Breach Their Duties to the Company and its Shareholders**

73.     On December 10, 2020, the Company held its 2020 Investor Day presentation and published the related slide presentation on Disney's website.

74.     During the presentation, Defendant Chapek stated the following regarding the Company's Disney+ subscribers:

> Disney+ has exceeded our wildest expectations with 86.8 million subscribers as of December 2. That's quite an achievement. This success has bolstered our confidence in our continued acceleration towards a DTC-first business model. And more importantly, it's launched The Walt Disney Company into a new era of delivering consumers truly exceptional entertainment build around our world renowned brands and franchises.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

75.     Defendant Chapek also discussed how the Company's new M&ED team would distribute Disney's content on the platform. In relevant part Defendant Chapek stated:

Our unique access to an incredible number of consumer touch points across our businesses gives us a clear advantage. Based on insights gained from this wealth of data, our distribution and commercialization team is able to better inform our creatives of consumer preferences. And the creative teams are empowered to make the high-quality branded entertainment they believe will resonate with audiences. This new organization also gives us maximum flexibility in determining when and on which platform content will be available. And this is especially important now given consumers' rapidly changing consumption behaviors and the prolonged uncertainty due to the pandemic.

As circumstances change, we will continue to consider these and other critical factors when determining what steps we may take to most effectively distribute our programming. Our goal is always to serve consumers in the best way possible.

76.     During the same presentation, Defendant Daniel touted how the consumer data Disney gathered would help the Company cater to Disney+ users and maximize audience engagement and commercial impact. In relevant part, Defendant Daniel stated as follows:

As a company, we were set up to achieve success in an increasingly dynamic environment. And as Bob mentioned, consumer behavior really does drive our decision-making. While we have always valued the data gained through our numerous consumer touch points, the rapid growth of our portfolio of D2C services provides us with an even

greater opportunity to understand their preferences. And we are using these insights to help determine how to optimally engage with our audiences. In fact, our team uses all of the information available to us when determining how best to allocate our creative content budgets across all platforms, with the goal to maximize both audience engagement and commercial impact. And we share this budgetary framework and critical insights with our creative partners as part of a truly collaborative planning process that delivers high-quality branded entertainment to achieve our established growth objectives for all of our platforms, from direct-to-consumer to linear networks to theatrical exhibition.

This exchange of information is a key pillar to our organization's overall strategy, which also relies on the increased flexibility provided by our mix of distribution options, including, in no particular order, releasing content through traditional windows, such as theaters and linear networks before it is made available on our direct-to-consumer services, particularly recognizing the actual exhibition's ability to help establish major franchises that are at the heart of our Disney flywheel; providing our accretive output simultaneously, day and date on both traditional and D2C platforms, in concert with our premier access commercialization strategy for the D2C component; and exclusively distributing our content on our streaming services, providing a constant flow of new titles for subscriber acquisition and to minimize churn. Of course, regardless of where it originates, all of our films and episodic series will inevitably end up as part of our incredibly rich and increasingly robust library of content on our D2C platforms.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Since streaming has quickly become a preferred method of consumption, we are prioritizing our D2C platforms, both in terms of how we distribute our content and also through an increased investment in our original programming for Disney+, Hulu, ESPN+ and the upcoming Star-branded international general entertainment offering.

\*   \*   \*

One of the primary benefits of our new organizational structure is our ability to quickly reevaluate and adjust our plans in light of changes in the marketplace, and we will continue to shift and optimize our mix of window theatrical, day-and-date and D2C exclusive offerings according to what is best for the consumer and our business.

77.     During the presentation, Defendant McCarthy provided profitability subscriber guidance for Disney+ (and related foreign streaming services such as Disney+ Hotstar, an Indian subscription video on demand streaming service owned by Disney that operates in India ). Defendant McCarthy also stood by the guidance that by the end of Disney's fiscal year 2024, Disney+ would have 230 to 260 million subscribers.

Today, I'm going to provide guidance across our services for fiscal 2024 to be consistent with the time frame we guided to at our last Investor Day. Let me start with Disney+ which, as you heard earlier today, had 86.8 million total paid subscribers as of December 2, approximately 30% of which were Disney+ Hotstar subscribers.

\*   \*   \*

If you recall, last year, we said that we expected Disney+ to have between 60 million and 90 million subscribers by the end of fiscal 2024. But as you know, our subscriber growth to date is well ahead of our original expectations. And we have an incredible and growing slate of

high-quality content that will capture a broader global audience and further fuel Disney+, making it what we believe is an even more compelling product.

These factors, along with the addition of our Star general entertainment offering in various markets and the growth of Disney+ Hotstar, give us an even greater optimism about our future. And they enable us to significantly increase our subscriber guidance. We now expect that by the end of fiscal 2024, we will have between 230 million and 260 million total paid Disney+ subscribers globally compared to the 60 million to 90 million we shared last year. I'll note that our prior outlook did not anticipate the launch of Disney+ Hotstar, which we now expect could be between 30% and 40% of our subscriber base by the end of fiscal 2024.

\*     \*     \*

Given the value of growing our subscriber base, as you've seen today, we plan to reinvest revenue generated from our better-than-expected subscriber growth back into content investment. Thus we continue to expect Disney+ to achieve profitability in fiscal 2024. Again, I'll note that this guidance includes Disney+, Star, Star+ and Disney+ Hotstar.

78.     During the presentation, in response to an analyst question, Defendant Chapek explained how the decision was made in determining when and on which platform or platforms Disney's content would be distributed, stating in relevant part:

So to me, it's really about over – of the 100 titles that we announced today, 80% of them are going first to Disney+, which I think says something about our pivot over to Disney+. But at the same time, we had $13 billion of box office last year. And that's obviously not something to sneeze at. And we know as The Walt Disney Company who've got this

plethora of franchises that we just showed you today, that we build those franchises through the theatrical exhibition window and we did $13 billion back in '19. So for us, it's about balance. And it's about following the consumer as they make that transition.

And so part of why we did the reorganization that we did is to ensure that we've got an organization that's flexible to read all the cues, whether it's the cessation of COVID or it's changing consumer behavior so that we can very nimbly make decisions as we go forward. And that 80% direct-to-consumer is not just Disney+, obviously, but that includes Hulu and Star as well.

79.     On the same day, the Company published the related power point presentation. The presentation stated that Disney was removing its prior guidance for Disney+ of 60 million to 90 million of paid subscribers by 2024 and reiterated its new guidance of 230 million to 260 million paid subscribers.

80.     Following the presentation, some analysts predicted that Disney+ would surpass Netflix as the most widely adopted paid streaming service in the world.

81.     On February 11, 2021, the Company published a press release announcing its first quarter 2021 financial results. On the earnings call held on the same day, Defendant McCarthy reassured investors that there was no need to revisit the 2024 Disney+ subscriber guidance, stating in relevant part:

We said at our Investor Day, which wasn't too long ago, that we expected to reach profitability in fiscal 2024. We're not going to change that at this point, although we are very pleased with the results that we just announced. But we are also, given the value of growing our sub base, we are continuing to invest in high-quality content. We believe that content is the single biggest driver to not only acquiring subs, but retaining them.

82.    On May 13, 2021, the Company issued a press release announcing its second quarter 2021 financial results. Disney announced that as of April 3, 2021, the Company had 103.6 million subscribers compared to March 28, 2020 of 33.5 million subscribers, which represented around a 200% increase.

83.    During the related earnings call, Defendant Chapek reiterated the Company's position regarding reaching 230 million to 260 million subscribers by 2024:

> We are uniquely positioned with the most compelling brands and franchises in entertainment, and we continue to deliver the high-quality, one-of-a-kind content that consumers want. That's clearly reflected in the success of Disney+ which amassed nearly 104 million paid subscribers as of the end of the second fiscal quarter. We are on track to achieve our guidance of 230 million to 260 million subscribers by the end of fiscal 2024.

84.    During the same call, Defendant McCarthy also stated, "[a]s [Defendant Chapek] mentioned earlier, we remain right on track to reach our fiscal 2024 guidance of 230 million to 260 million subs[cribers], powered by the addition of 30 million paid Disney+ subs[cribers] in the first half of the year."

85.    The statements referenced in ¶¶74-79, 81, 83-84 were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by the Individual Defendants: (i) that Disney+ was suffering decelerating subscriber growth, losses, and cost overruns; (ii) that the true costs incurred in connection with Disney+ had been concealed by Disney executives by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter in order to improperly shift costs out of the Disney+ segment; (iii) that M&ED had made

platform distribution decisions based not on consumer preference, consumer behavior, or the desire to maximize the size of the audience for the content as represented, but based on the desire to hide the full costs of building Disney+'s content library; (iv) that the Company was not on track to achieve its 2024 Disney+ paid global subscriber and profitability targets, that such targets were not achievable, and they such estimates lacked a reasonable basis in fact; and (v) that as a result of the foregoing, the Individual Defendants had materially misrepresented the actual performance of Disney+, the sustainability of Disney+'s historical growth trends, the profitability of Disney+, and the likelihood that Disney could achieve its 2024 Disney+ subscriber and profitability targets.

**The Truth Begins to Emerge, and the Individual Defendants Double Down on their False and Misleading Statements**

86.    On September 21, 2021, Defendant Chapek gave a virtual presentation at the Goldman Sachs Communacopia Conference. During the presentation, Defendant Chapek acknowledged that Disney+ subscriber growth had slowed in the fourth quarter of the fiscal year ending on October 2, 2021. In response to the interviewer's request for "an update on Disney+ trends this far, at this in the quarter," Defendant Chapek stated, in pertinent part: "In Q4, I think what you can expect to see is that our global paid subs will increase by low single digit millions of subscribers versus Q3. But importantly, our core market sub growth will continue both domestically and internationally in Q4, but we hit some headwinds." Defendant Chapek still re-affirmed the Company's 2024 goals for Disney+ subscriptions, stating, "[w]e're very confident about our long-term sub growth as we have been."

87.    This new information concerning the number of global paid Disney+ subscribers failed to meet the market's expectations. On the same day, *CNBC* reported the disappointing news, in relevant part:

Disney expects to add "low single-digit millions" of streaming subscribers in the fourth quarter, Chapek said. Disney shares ended the session down 4.1% after Chapek's comments at the virtual Goldman Sachs Communacopia Conference.

Chapek said "mobilizing partners" in Latin America to push Disney's new Star+ streaming service, the Covid-related suspension of the India Premier League – whose games air on Disney's Hotstar – and production delays from the delta variant have all hurt subscriber numbers in the fourth quarter.

"We are going to see a little bit more noise than maybe the Street projects quarter to quarter," Chapek said. "The resurgence of Covid and delta did impact some of our productions."

Chapek's forecast is significantly lower than some analyst estimates. Deutsche Bank analyst Bryan Kraft had projected Disney+ net adds of about 13 million in the quarter.

Global production delays will be "very short term," Chapek said. But he acknowledged there won't be as much new programming in the fourth quarter "than we might have expected," which will affect subscriber growth.

Disney has projected 230 million to 260 million Disney+ subscribers by 2024. Disney said in August it had 116 million Disney+ subscribers. Chapek cautioned investors that quarter-to-quarter growth "is not linear" and some choppiness is expected. Still, he remained confident in Disney's long-term growth outlook.

88.     On this news, Disney's common stock fell $7.44 per share, or more than 4%, to close at $171.17 on September 21, 2021.

89.     On November 10, 2021, Disney issued a press release announcing its fourth quarter and full year 2021 financial results, missing expectations of 119.6 million subscribers, $18.78 billion in revenues, and adjusted earnings per share of 49 cents. The Company only added 2.1 million customers during the quarter, revenue of $18.53 billion, and adjusted earnings per share of 37 cents.

90.     During the related earnings call after the market closed on November 10, 2021, Defendant Chapek downplayed the Company's subscriber numbers and stood by Disney's 2024 guidance.

> I want to reiterate that we remain focused on managing our DTC business for the long term, not quarter-to-quarter, and we're confident we are on the right trajectory to achieve the guidance that we provided at last year's Investor Day, reaching between 230 million and 260 million paid Disney+ subscribers globally by the end of fiscal year 2024, and with Disney+ achieving profitability that same year.

91.     Defendant McCarthy also reiterated Disney+'s profitability and 2024 subscriber guidance.

> As Bob mentioned, we are increasing our overall long-term content expense for Disney+, and we are well positioned to achieve the subscriber target of 230 million to 260 million by fiscal 2024 that we laid out at last year's Investor's Day. And we also remain confident in our expectation that Disney+ will achieve profitability in fiscal 2024.

92.     On this news, the Company's stock fell $12.34 per share, or more than 7%, on November 11, 2021.

93.     On February 9, 2022, Disney issued a press release announcing its fourth quarter and full year 2021 financial results. During the related earnings call, Defendant Chapek stated:

As I've said before, we continue to manage our services for the long-term, and maintain confidence in our guidance of 230-260 million total paid Disney+ subscribers globally by the end of Fiscal 2024.

94.   On August 10, 2022, Disney issued a press release announcing its third quarter 2022 financial results. During the related earnings call, Defendant McCarthy lowered the Company's 2024 guidance for Disney+.

Finally, before we move to Q&A, I want to spend some time sharing a few updates on our fiscal 2024 guidance for Disney+. We are providing more detail on subscriber targets by separating our guidance into 2 categories: core Disney+ and Disney+ Hotstar. Excluding the impact of any significant future macro headwinds, our core Disney+ subscriber target range is 135 million to 165 million by the end of fiscal 2024, largely consistent with previously provided guidance that non-Hotstar Disney+ subscribers in 2024 would approximate 60% to 70% of the expected 230 million to 260 million total subscriber base.

We are, however, updating subscriber guidance for Disney+ Hotstar to up to 80 million subscribers by the end of fiscal 2024. We intend to refine this target over time as subscriber visibility in India will be clearer once the ICC and BCCI cricket rights sales processes are completed. As you may know, we recently made the disciplined decision to not proceed with the Indian Premier League digital rights, and we'll evaluate these rights with that same discipline.

95.   However, Defendant McCarthy reaffirmed the Company's position that Disney+ would achieve profitability by 2024.

As we sit here today, we remain confident that Disney+ will achieve profitability in fiscal 2024 and look forward to several upcoming catalysts, including reaching a steady state of tentpole original content

releases, delivery of premium general entertainment and international local originals and the upcoming launch of our ad-supported tier, alongside the new pricing structure announced earlier today.

96.     The statements referenced in ¶¶86, 90-91, 93-95 above were materially false and misleading or omitted necessary information when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, and financial condition, which were known to or recklessly disregarded by Individual Defendants. Specifically, the Individual Defendants failed to disclose to investors that: (a) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (b) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (c) M&ED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (d) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (e) the Company failed to maintain internal controls.

97.     On November 8, 2022, Disney issued a press release announcing its fourth quarter and full year 2022 financial results. Therein, Defendant Chapek was quoted stating:

Our fourth quarter saw strong subscription growth with the addition of 14.6 million total subscriptions, including 12.1 million Disney+ subscribers. The rapid growth of Disney+ in just three years since launch is a direct result of our strategic decision to invest heavily in creating

incredible content and rolling out the service internationally, and we expect our DTC operating losses to narrow going forward and that Disney+ will still achieve profitability in fiscal 2024, assuming we do not see a meaningful shift in the economic climate. By realigning our costs and realizing the benefits of price increases and our Disney+ ad-supported tier coming December 8, we believe we will be on the path to achieve a profitable streaming business that will drive continued growth and generate shareholder value long into the future. And as we embark on Disney's second century in 2023, I am filled with optimism that this iconic company's best days still lie ahead.

98.    The Company's revenue for the fourth quarter grew only 9% to $20.15 billion, below analyst estimates of $21.36 billion; sales were only $20.2 billion, about $1 billion short of analysts' projections; and earnings of $.30 per share were below the average analyst estimate of about $0.51. The Company's D2C segment reported an operating loss of almost $1.5 billion compared to a $630 million loss in the same quarter in 2021. Revenue in the D2C segment increased only 8% to $4.9 billion.

99.    The Company also reported a decline in its average revenue per Disney+ subscriber, as more customers subscribed through a discounted bundle with the Company's other services. Notably, the bundled offering made up about 40% of domestic subscribers, confirming that Disney was relying on short-term promotional efforts to boost subscriber growth while impairing the platform's long-term profitability.

100.    On this news, the Company's stock fell $13.15 per share, or about 13%, on an unusually high volume of shares traded.

101.    On November 20, 2022, the Board announced that it had terminated Defendant Chapek, only five months after it had voted to extend his contract in June

2022. Defendant Daniel was fired less than 24 hours later, and the Board appointed Defendant Iger to take over as CEO of the Company.

102.   On November 21, 2022, *The Wall Street Journal* issued a report titled *Walt Disney CFO, Others Brought Concerns to Board Over Bob Chapek*. The report shed light on several issues that ultimately led to Defendant Chapek's dismissal. In addition, the report disclosed a cost-shifting scheme employed by the Individual Defendants to hide certain expenses that should have been attributed to Disney+ so that the streaming service would appear closer to profitability than it actually was. According to the report, not only did the Individual Defendants know about this strategy and intentionally employ it to deceive investors, but reportedly Defendant McCarthy had internally expressed her concerns about its propriety.  The report stated, in relevant part:

> The trouble came to a head Nov. 8, when Mr. Chapek hosted a conference call with analysts after Disney's weaker-than-expected quarterly report. Disney had just reported a loss of $1.47 billion in its streaming business, more than twice the loss reported in the prior-year quarter and had underperformed analysts' expectations in revenue and income.
>
> Profit margins at the theme parks—Disney's best-performing division over the past year—were shrinking, the company said, and the streaming segment's goal of profitability by September 2024 could be in danger if the economy worsened. Despite the gloomy report, Mr.Chapek's tone on the call was upbeat and his outlook positive.
>
> "We believe we are on a path to profitable streaming business that generates shareholder value long into the future," he said.

*       *       *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Ms. McCarthy, the CFO, told board members that she wasn't happy with the way Mr. Chapek had communicated with investors during the conference call, people familiar with the matter said.

\* \* \*

Mr. Iger had long expressed displeasure with the organizational structure Mr. Chapek put in place to handle content distribution, according to people familiar with the matter.

Shortly after taking the reins of the entertainment giant, Mr. Chapek had restructured the company's television and film operations and created a distribution arm to determine the best platform for any given content, whether that is a streaming service, a TV network or movie theaters. As part of that change, content executives no longer had control over their budgets.

Mr. Chapek said at the time that the moves were a recognition of changing consumer habits and were meant to give priority to its streaming-video services. Mr. Iger has told people close to him that he didn't think the new regime made sense, said the people, adding that it took away freedom from the creative side of the business.

\* \* \*

But the streaming division, which Mr. Chapek has said he expected to be profitable by the company's 2024 fiscal year, has lost more than $8.5 billion since Disney+ was launched and has posted bigger operating losses in each of the past four quarters. Under Mr. Chapek, Disney has increased its content spending dramatically—to around $30 billion this year alone.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Like many of its rivals, Disney is now trying to shift from a growth-oriented streaming strategy to profitability, but is doing so in a difficult economic environment and an intensely competitive market.

Disney is moving some shows that were supposed to be Disney+ originals and air them first on other networks including the Disney Channel, people familiar with the matter said. By doing so, the costs of production and marketing of the shows—which included mystery show "The Mysterious Benedict Society" and medical drama "Doogie Kameāloha, M.D."—would be shifted away from the streaming service, making its financial performance look better, they said.

Ms. McCarthy was concerned about this strategy, the people said.

103. Other news outlets similarly reported that Defendant Chapek was "cooking the books, engaging in a series of deceptive accounting practices, in an effort to hide actual losses the company was seeing related to its signature streaming service" and that "he disguised Disney+'s losses by moving around budgets for its original shows."

**The Truth Is Revealed**

104. On February 8, 2023, the Company issued a press release announcing first quarter 2023 financial results. Therein, Disney reported that Disney+ lost 2.4 million subscribers and that the D2C business segment reported an increase in operating loss from $0.5 billion to $1.1 billion, in part because of a higher loss at Disney+ which reflected higher programming and production costs.

105. During the related earnings call, Defendant Iger stated that the Company had to be restructured to make its online streaming business profitable:

In 2019, Disney+ launched, with nearly 500 films and 7,500 episodes of television from across the world of Disney. Three years later, its

meteoric rise is considered one of the most successful results in the history of the media business.

Now it's time for another transformation, one that rationalizes our enviable streaming business and puts it on a path to sustained growth and profitability while also reducing expenses to improve margins and returns and better positioning us to weather future disruption, increased competition and global economic challenges. We must also return creativity to the center of the company, increase accountability, improve results and ensure the quality of our content and experiences.

106. Defendant Iger emphasized that to restore the Company's success, creative power had to be returned to the Company's creative executives, including distribution decisions, which Defendant Chapek had taken away as part of his October 2020 restructuring plan. In relevant part, Defendant Iger stated:

Now the details. Our company is fueled by storytelling and creativity. And virtually every dollar we earn, every transaction, every interaction with our consumers emanates from something creative. I've always believed that the best way to spur great creativity is to make sure that people who are managing the creative process feel empowered.

Therefore, our new structure is aimed at returning greater authority to our creative leaders and making them accountable for how their content performs financially. Our former structure severed that link, and it must be restored. Moving forward, our creative teams will determine what content we're making, how it is distributed and monetized and how it gets marketed.

107. Defendant Iger also announced that the Company would be reorganized into three core business segments to allow creative executives to maximize revenue and growth, stating, in relevant part:

Managing costs, maximizing revenue and driving growth from the content being produced will be their responsibility. Under our strategic reorganization, there will be 3 core business segments: Disney Entertainment, ESPN and Disney Parks, Experiences and Products.

\* \* \*

These organizational changes will be implemented immediately, and we will begin reporting under the new business structure by the end of the fiscal year. This reorganization will result in a more cost-effective, coordinated and streamlined approach to our operations. And we are committed to running our businesses more efficiently, especially in a challenging economic environment.

108. With regard to reining in Disney's costs, Defendant Iger stated, in relevant part:

[W]e are targeting $5.5 billion of cost savings across the company. First, reductions to our non-content costs will total roughly $2.5 billion, not adjusted for inflation. $1 billion in savings is already underway, and Christine will provide more details. But in general, the savings will come from reductions in SG&A and other operating costs across the company.

To help achieve this, we will be reducing our workforce by approximately 7,000 jobs. While this is necessary to address the challenges we're facing today, I do not make this decision lightly. I have enormous respect and appreciation for the talent and dedication of our employees worldwide, and I'm mindful of the personal impact of these changes.

On the content side, we expect to deliver approximately $3 billion in savings over the next few years, excluding sports. Christine will be

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  providing more details during the call. Turning to our streaming

2  businesses. I'm proud of what we've been able to achieve since the

3  launch of Disney+ just 3 years ago. We are delivering more content

4  with greater quality in more ways, in more places and to larger

5  audiences.

6      109.   Additionally, Defendant Iger stated that the Company would no longer

7  be providing long-term subscriber guidance for Disney+:

8  Like many of our peers, we will no longer be providing long-term

9  subscriber guidance in order to move beyond an emphasis on short-

10  term quarterly metrics, although we will provide color on relevant

11  drivers. Instead, our priority is the enduring growth and profitability of

12  our streaming business.

13      110.   On May 10, 2023, Disney issued a press release announcing

14  disappointing second quarter 2023 financial results. The Company reported that

15  Disney+ had lost subscribers for the second quarter in a row, further confirming that

16  the 2024 Disney+ targets had never been achievable. Disney+ had lost 4 million paid

17  subscribers, when analysts expected Disney+ to add 1.7 million subscribers.

18  Streaming revenue increased 12% year over year due, in part, to recent price hikes

19  necessitated by the streaming service's large losses.

20      111.   During the related earnings call, Defendant Iger again acknowledged that

21  "it's critical we rationalize the volume of content we're creating and what we're

22  spending to produce our content." He further announced that Disney was planning

23  another price increase, at least for the Disney+ ad-free tier, risking even further

24  subscriber losses.

25      112.   On this news, the price of Disney stock fell $8.83 per share, over 8% on

26  May 11, 2023, on unusually high trading volume.

27

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**The Company's Proxy Statements Contained False and Misleading Statements**

113.   On January 19, 2021, the Company filed its annual proxy statement with the SEC pursuant to Section 14(a) of the Exchange Act ("2021 Proxy Statement"). Defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Igar, Lagomasino, Parker, and Rice solicited the 2021 Proxy Statement, which contained material misstatements and omissions.

114.   The 2021 Proxy Statement asked Disney stockholders to vote to, among other things: (1) re-elect defendants Chapek, Arnold, Barra, Catz, deSouza, Froman, Igar, Lagomasino, Parker, and Rice to the Board; and (2) approve, on an advisory basis, the Company's executive compensation.

115.   The 2021 Proxy Statement notes that "[a]s CEO, and during one of the most challenging environments the Company has faced, Mr. Chapek adeptly managed the enormous disruption to the Company's business, while at the same time restructuring Disney's media and entertainment businesses to fuel the long-term creative and financial growth of the Company." The Compensation Committee recognized the following key performance highlights when considering Defendant Chapek's compensation:

- In the wake of COVID-19's impact on theaters and our content pipeline, worked to quickly program new offerings on our DTC and linear channels, while preparing plans to responsibly reopen our parks and production operations around the world.
- Launched our direct-to-consumer services in several key markets, while converting Hotstar to Disney+ Hotstar and announcing the launch of a Star international general entertainment service planned for fiscal 2021 in Latin America and Europe.
- Enhanced and focused the Company's D&I efforts through a new, six-pillar approach that puts a premium on Transparency,

Representation, Accountability, Community, Inclusive Content and Culture. Began delivering change by establishing the CEO Diversity & Inclusion Council, championing the Black Talent Network, investing in inclusive storytelling and requiring leader accountability.

• Recognition of Disney as one of the "World's Most Admired Companies" by Fortune (#4 overall and #1 in entertainment) and #2 in MBLM's annual Brand Intimacy Study, which measures the bonds consumers form with the brands they use and love.

116. In the section titled the "Board's Role in Risk Oversight," the 2021 Proxy Statement stated, in relevant part:

As noted in the Company's *Corporate Governance Guidelines*, the Board, acting directly or through committees, is responsible for "assessing major risk factors relating to the Company and its performance" and "reviewing measures to address and mitigate such risks." In discharging this responsibility, the Board, either directly or through committees, assesses both (a) risks that relate to the key economic and market assumptions that inform the Company's business plans (including significant transactions) and growth strategies, and (b) significant operational risks related to the conduct of the Company's day-to-day operations.

Risks relating to the market and economic assumptions that inform the Company's business plans and growth strategies are specifically addressed with respect to each business unit in connection with the Board's review of the Company's long-range plan. The Board also has the opportunity to address such risks at each Board meeting in connection with its regular review of significant business and financial

developments. The Board reviews risks arising out of specific significant transactions when these transactions are presented to the Board for review or approval.

Significant operational risks that relate to ongoing business operations are the subject of regularly scheduled reports to either the full Board or one of its committees. The Board acting through the Audit Committee reviews as appropriate whether these reports cover the significant risks that the Company may then be facing.

Each of the Board's committees addresses risks that fall within the committee's areas of responsibility. The Audit Committee addresses general risks as well as risks arising out of financial planning and reporting, internal controls and information technology. The Audit Committee reserves time at each meeting for private sessions with the Chief Financial Officer, General Counsel, head of the internal audit department and outside auditors. The Compensation Committee addresses risks arising out of the Company's executive compensation programs, as described in more detail in the section titled "*Executive Compensation—Other Compensation Information—Risk Management Considerations*" and workplace equity. The Governance and Nominating Committee addresses risks arising out of corporate governance, director compensation, investor engagement, political contributions and the Company's ESG programs. The Governance and Nominating Committee annually reviews domestic political contribution activity as well as the procedures and controls related to political contributions. The operational risks periodically reviewed by committees are also reviewed by the entire Board when a committee or the Board determines this is appropriate.

117.   The 2021 Proxy Statement further stated that "Company has *Standards of Business Conduct*, which are applicable to all employees of the Company, including the principal executive officer, the principal financial officer and the principal accounting officer. The Board has a separate *Code of Business Conduct and Ethics for Directors . . . ."*

118.   The 2021 Proxy Statement was materially false and misleading because it failed to disclose that: (i) although Disney claimed its directors had a direct role in assessing the Company's risks they were ineffectively doing so; (ii) contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Disney to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements. Further, the 2021 Proxy Statement was also false and misleading because the Individual Defendants failed to implement and oversee effective internal controls over the Company's core operations and to manage risks associated with the essential and mission-critical maintenance of existing subscribers and addition of new ones.

119.   Because of the false and misleading statements contained in the 2021 Proxy Statement, Company shareholders voted, *inter alia*, to re-elect certain Director Defendants to the Board thus allowing them to continue breaching their fiduciary duties to the Company.

120.   On January 19, 2022, the Company filed its annual proxy statement with the SEC pursuant to Section 14(a) of the Exchange Act ("2022 Proxy Statement"). Defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

121.   The 2022 Proxy Statement asked Disney stockholders to vote to, among other things: (1) re-elect defendants Chapek, Arnold, Barra, Catz, Chang, deSouza, Froman, Lagomasino, McDonald, Parker, and Rice to the Board; and (2) approve, on an advisory basis, the Company's executive compensation.

122.   The 2022 Proxy Statement states the following with respect to Defendant Chapek:

> In fiscal 2021, Mr. Chapek, as Chief Executive Officer, delivered strong performance given the unprecedented challenges resulting from the COVID-19 pandemic and meaningful shareholder value, driven by exceptional execution of the Company's key strategic initiatives.

> Since March 2020, Mr. Chapek has adeptly managed the significant disruption to the Company's businesses resulting from the COVID-19 pandemic and guided the Company's new management team leading our direct-to-consumer ("DTC") efforts. In fiscal 2021, under Mr. Chapek's leadership, the Company made significant progress on its long-term strategic plan with the following achievements:

> Reorganized media and entertainment businesses to align with Mr. Chapek's strategic goals of accelerating the DTC strategy and centralizing distribution and commercialization activities;

> - Increased subscribers at Disney+, Hulu and ESPN+;
> - Continued expansion of the Company's DTC efforts internationally, launching DTC platforms in several key international markets ;
> - Took meaningful and innovative steps at our parks and experiences business while reopening our parks, including the development of Disney Genie and new Magic Key offerings.

123.   In the section titled the "Board's Role in Risk Oversight," the 2022 Proxy stated, in relevant part:

As noted in the Company's *Corporate Governance Guidelines*, the Board, acting directly or through committees, is responsible for "assessing major risk factors relating to the Company and its performance" and "reviewing measures to address and mitigate such risks." In discharging this responsibility, the Board, either directly or through committees, assesses both (a) risks that relate to the key economic and market assumptions that inform the Company's business plans (including significant transactions) and growth strategies, and (b) significant operational risks related to the conduct of the Company's day-to-day operations.

Risks relating to the market and economic assumptions that inform the Company's business plans and growth strategies are specifically addressed with respect to each business unit in connection with the Board's review of the Company's long-range plan. The Board also has the opportunity to address such risks at each Board meeting in connection with its regular review of significant business and financial developments. The Board reviews risks arising out of specific significant transactions when these transactions are presented to the Board for review or approval.

Significant operational risks that relate to ongoing business operations are the subject of regularly scheduled reports to either the full Board or one of its committees. The Board acting through the Audit Committee reviews as appropriate whether these reports cover the significant risks that the Company may then be facing.

Each of the Board's committees addresses risks that fall within the committee's areas of responsibility. The Audit Committee addresses general risks as well as risks arising out of financial planning and reporting, internal controls and information technology. The Audit Committee reserves time at each meeting for private sessions with the Chief Financial Officer, General Counsel, head of the internal audit department and outside auditors. The Compensation Committee addresses risks arising out of the Company's executive compensation programs, as described in more detail in the section titled "*Executive Compensation—Other Compensation Information—Risk Management Considerations*" and workplace equity. The Governance and Nominating Committee addresses risks arising out of corporate governance, director compensation, investor engagement, political contributions and the Company's ESG programs. The Governance and Nominating Committee annually reviews domestic political contribution activity as well as the procedures and controls related to political contributions. The operational risks periodically reviewed by committees are also reviewed by the entire Board when a committee or the Board determines this is appropriate.

124.   The 2022 Proxy Statement further stated that "Company has *Standards of Business Conduct*, which are applicable to all employees of the Company, including the principal executive officer, the principal financial officer and the principal accounting officer. The Board has a separate *Code of Business Conduct and Ethics for Directors* . . . ."

125.   The 2022 Proxy Statement was materially false and misleading because it failed to disclose that: (i) although Disney claimed its directors had a direct role in assessing the Company's risks they were ineffectively doing so; (ii) contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the

Board and its committees did not adequately exercise these functions and were causing or permitting Disney to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements. Further, the 2022 Proxy Statement was also false and misleading because the Individual Defendants failed to implement and oversee effective internal controls over the Company's core operations and to manage risks associated with the essential and mission-critical maintenance of existing subscribers and addition of new ones.

126.   Because of the false and misleading statements contained in the 2022 Proxy Statement, Company shareholders voted, *inter alia*, to re-elect certain Director Defendants to the Board thus allowing them to continue breaching their fiduciary duties to the Company.

## DISNEY REPURCHASES SHARES DURING THE RELEVANT PERIOD

127.   During the Relevant Period, the Individual Defendants caused the Company to repurchase its common stock at artificially inflated prices. In total, during the Relevant Period, the Company spent approximately $78.7 million to repurchase 557,313 shares at artificially inflated prices. The actual value of the Company's stock was $86.75 per share, as of closing on November 9, 202, therefore, Disney should have spent approximately $48.3 million to repurchase its stock during the Relevant Period. As a result of the overpayment, Disney suffered damages in the amount of approximately $30.3 million.

128.   The following chart details the Company's repurchase transactions during the Relevant Period:

| Repurchase Period | Number of Shares | Repurchase Price Per Share | Repurchase Amount | Actual Value of Repurchased Shares ($86.75) | Overpayment |
|---|---|---|---|---|---|
| 12/1/2020-1/2/2021 | 18,664 | $170.44 | $3,181,092.16 | $1,619,102.00 | $1,561,990.16 |
| 1/3/2021-1/31/2021 | 18,215 | $173.31 | $3,156,841.65 | $1,580,151.25 | $1,576,690.40 |
| 2/1/2021-2/28/2021 | 18,230 | $183.36 | $3,342,652.80 | $1,581,452.50 | $1,761,200.30 |
| 3/1/2021-4/3/2021 | 18,820 | $193.32 | $3,638,282.40 | $1,632,635.00 | $2,005,647.40 |
| 4/4/2021-4/30/21 | 17,873 | $187.26 | $3,346,897.98 | $1,550,482.75 | $1,796,415.23 |
| 5/1/2021-5/31/2021 | 19,292 | $172.93 | $3,336,165.56 | $1,673,581.00 | $1,662,584.56 |
| 6/1/2021-7/3/2021 | 19,511 | $175.91 | $3,432,180.01 | $1,692,579.25 | $1,739,600.76 |
| 7/4/2021-7/31/2021 | 15,923 | $180.39 | $2,872,349.97 | $1,381,320.25 | $1,491,029.72 |
| 8/1/2021-8/31/2021 | 15,510 | $176.90 | $2,743,719.00 | $1,345,492.50 | $1,398,226.50 |
| 9/1/2021-10/2/2021 | 15,493 | $179.52 | $2,781,303.36 | $1,344,017.75 | $1,437,285.61 |
| 10/3/2021-10/31/2021 | 16,599 | $171.24 | $2,842,412.76 | $1,439,963.25 | $1,402,449.51 |
| 11/1/2021-11/30/2021 | 23,036 | $157.38 | $3,625,405.68 | $1,998,373.00 | $1,627,032.68 |
| 12/1/2021-1/1/2022 | 28,624 | $147.64 | $4,226,047.36 | $2,483,132.00 | $1,742,915.36 |
| 1/2/2022-1/31/2022 | 25,595 | $142.60 | $3,649,847.00 | $2,220,366.25 | $1,429,480.75 |
| 2/1/2022-2/28/2022 | 20,873 | $150.26 | $3,136,376.98 | $1,810,732.75 | $1,325,644.23 |
| 3/1/2022-4/2/2022 | 24,942 | $168.84 | $4,211,207.28 | $2,163,718.50 | $2,047,488.78 |
| 4/3/2022-4/30/2022 | 23,363 | $125.98 | $2,943,270.74 | $2,026,740.25 | $916,530.49 |
| 5/1/2022-5/31/2022 | 42,751 | $105.99 | $4,531,178.49 | $3,708,649.25 | $822,529.24 |
| 6/1/2022-7/2/2022 | 36,469 | $97.09 | $3,540,775.21 | $3,163,685.75 | $377,089.46 |
| 7/1/2022-7/31/2022 | 30,343 | $100.81 | $3,058,877.83 | $2,632,255.25 | $426,622.58 |
| 8/1/2022-8/31/2022 | 22,440 | $119.99 | $2,692,575.60 | $1,946,670.00 | $745,905.60 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 9/1/2022-10/1/2022 | 23,058 | $107.38 | $2,475,968.04 | $2,000,281.50 | $475,686.54 |
| 10/2/2022-10/31/2022 | 25,673 | $99.85 | $2,563,449.05 | $2,227,132.75 | $336,316.30 |
| 11/1/2022-11/30/2022 | 36,016 | $94.01 | $3,385,864.16 | $3,124,388.00 | $261,476.16 |
| **Total** | **557,313** | | **$78,714,741.07** | **$48,346,902.75** | **$30,367,838.32** |

## THE INSIDER SELLING DEFENDANTS SELL
## COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

129.   During the period of wrongdoing described above, the Insider Selling Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- On August 31, 2021, Defendant Chapek sold 10,587 shares for proceeds of over $1.9 million.

- Between January 15, 2021 and January 18, 2022, Defendant McCarthy sold 79,481 shares with proceeds of over $12.9 million.

130.   While many of the Company's shareholders lost significant money when the price of Disney shares dropped substantially at the end of the Relevant Period, the Insider Selling Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by shareholders.

131.   As a result, the Insider Selling Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Disney stock and stock options they held.

## AN INVESTOR FILES A SECURITIES CLASS ACTION

132.   On May 12, 2023, a purchaser of Disney stock filed a securities class action complaint captioned *Local 272 Labor-Management Pension Fund v. The Walt Disney Company et al.*, Case No. 2:23-cv-03661, in the United States District Court for the Central District of California against Disney and Defendants Chapek,

McCarthy, and Daniel (the "Securities Class Action"). The Securities Class Action complaint alleges that throughout the class period of December 10, 2020 to November 8, 2022, defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Securities Class Action alleges that defendants failed to disclose to investors that: (a) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (b) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (c) M&ED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (d) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (e) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO DISNEY

133. As a result of the Individual Defendants' improprieties, Disney disseminated improper public statements concerning Disney's operations, prospects, and internal controls. This misconduct has devastated Disney's credibility.

134. As a direct and proximate result of the Individual Defendants' actions, Disney has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

135.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Disney's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

136.   In addition, the actions of the Individual Defendants have irreparably damaged Disney's corporate image and goodwill. For at least the foreseeable future, Disney will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Disney's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

137.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

138.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

139.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took

the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Individual Defendants.

140. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

141. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Disney and was at all times acting within the course and scope of such agency.

**PLAINTIFF HAS BEEN A SHAREHOLDER AT ALL RELEVANT TIMES AND WILL FAIRLY AND ADEQUATELY REPRESENT THE COMPANY'S AND ITS SHAREHOLDERS' INTERESTS**

142. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

143. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

144. Plaintiff is an owner of Disney common stock and was an owner of Disney common stock at all times relevant hereto.

145. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting the Company's rights.

## DEMAND IS FUTILE BECAUSE EACH DIRECTOR DEFENDANT FACES A SUBSTANTIAL LIKELIHOOD OF PERSONAL LIABILITY

146.   At the time Plaintiff commenced this action, the Board consisted of eleven members, including Defendants Barra, Catz, Chang, deSouza, Froman, Iger, Lagomasino, McDonald, Parker, and Rice and non-party Carolyn N. Everson. The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

147.   The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Disney's business, operations, prospects, internal controls, and financial statements.

148.   Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

149.   The Director Defendants failed to implement an audit processes that would reveal the true costs incurred in connection with Disney+ and the improper shifting of costs out of the Disney+ business segment. This is shown by, *inter alia*, the fact that there was no board-level committee charged with evaluating and managing risks to the Company and that there was no system for ensuring that mission-critical information was provided directly to the Board rather than being syphoned through the Company's management.

150.   Certain Director Defendants also approved the 2021 Proxy Statement and the 2022 Proxy Statement and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

151.   The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith.

152.   If the Director Defendants were to bring a suit on behalf of Disney to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. For this reason, a demand would be futile.

**The Audit Committee Defendants Face
a Greater Likelihood of Personal Liability**

153.   As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants (Catz, deSouza, and Rice), were obligated to review the Company's annual and quarterly reports to ensure their accuracy. In addition, they were responsible for the effectiveness of the Company's internal controls and the Company's compliance with applicable laws and regulations. During the Relevant Period, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's reporting, instead engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. They failed to adequately exercise their risk management and risk assessment functions and failed

to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls, and procedures. For this reason, demand is futile as to the Audit Committee Defendants.

**The Governance Committee Defendants**
**Face a Greater Likelihood of Personal Liability**

154.   The Governance Committee Defendants (Chang, Froman, Lagomasino, and Parker) are sophisticated members of the Board with substantial training and experience on corporate governance matters and the importance of accurate disclosures to the investing public. Accordingly, the Governance Committee Defendants had to have known, *inter alia*, that (i) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (ii) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (iii) M&ED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; and (iv) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets. Additionally, during the Relevant Period, the Governance Committee Defendants recommended the nomination and renomination of unqualified directors for their election and reelection as members of the Board.  Therefore, the Governance Committee Defendants face a substantial likelihood of personal liability and cannot exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

**The Compensation Committee Defendants**
**Face a Greater Likelihood of Personal Liability**

155.   The Compensation Committee Defendants (Barra, Lagomasino, McDonald, and Parker), as members of the Compensation Committee during the Relevant Period, knowingly disregarded their duties to oversee and, as appropriate, determine the annual salaries and other compensation of the Company's executive officers and assist and recommend to the Board appropriate compensation policies and practices, and approve performance bonuses to executives. Instead, the Compensation Committee Defendants approved unwarranted bonuses and compensation to the Company's executives and directors.

156.   Pursuant to the Company's proxy statement filed on February 10, 2023 (the "2023 Proxy Statement"), the Compensation Committee Defendants approved the following compensation to certain Director Defendants for fiscal year 2022:

- Defendant Arnold was paid $214,327 in cash, awarded $289,953 in stocks, and received $67,701 as other compensation for a total benefit of $571,981.

- Defendant Barra was paid $125,000 in cash and awarded $236,657 in stock for a total benefit of $361,657.

- Defendant Catz was paid $125,000 in cash, awarded $236,657 in stocks, and received $50,000 as other compensation for a total benefit of $439,143.

- Defendant Chang was paid $125,000 in cash, awarded $236,657 in stocks, and received $41,520 as other compensation for a total benefit of $403,177.

- Defendant deSouza was paid $125,000 in cash, awarded $236,657 in stocks, and received $5,296 as other compensation for a total benefit of $366,953.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Defendant Froman was paid $125,000 in cash, awarded $236,657 in stocks, and received $71,968 as other compensation for a total benefit of $433,625.
- Defendant Lagomasino was paid $159,973.00 in cash, awarded $236,657 in stocks, and received $100 as other compensation for a total benefit of $396,730.
- Defendant McDonald was paid $125,000 in cash and awarded $236,657 in stocks for a total benefit of $361,657.
- Defendant Parker was paid $125,000 in cash and awarded $236,657.00 in stocks for a total benefit of $361,657.
- Defendant Rice was paid $125,000 in cash, awarded $236,657 in stocks, and received $70,000 as other compensation for a total benefit of $431,657.

157.   Therefore, the Compensation Committee Defendants face a substantial likelihood of personal liability and cannot exercise disinterested business judgment in considering a demand to initiate and prosecute this action.

**Defendant Iger Lacks Independence**

158.   Defendant Iger is not an independent director, as conceded in the Company's 2023 Proxy Statement. Iger is not independent because his principal occupation is CEO of Disney. On July 12, 2023, Disney announced that it had entered into an employment agreement with Defendant Iger to extend the term of services as CEO and senior most executive officer to December 31, 2026. Effective as of the date of the amendment, Defendant Iger's target annual incentive bonus opportunity for each full fiscal year during the term commencing after the effective date of the amendment will be 500% of his annual base salary. Defendant Iger's target annual incentive plan bonus opportunity for the current fiscal year will be based on the sum of the pro-rated target bonus opportunity previously in effect and the pro-rated

amended target bonus opportunity. The amendment also provides that the post-retirement security benefits to be provided to Defendant Iger for five years following his termination of employment under his current employment agreement. Therefore, Defendant Iger lacks independence to prosecute this action.

## FIRST CAUSE OF ACTION
### Against the Individual Defendants for Breach of Fiduciary Duties

159. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

160. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Disney's business and affairs.

161. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

162. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Disney.

163. In breach of their fiduciary duties owed and owe to Disney, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose that, *inter alia*, (a) Disney+ was experiencing decelerating subscriber growth, losses, and cost overruns; (b) by debuting certain content intended for Disney+ initially on Disney's legacy distribution channels and then making the shows available on Disney+ thereafter, Disney executives were able to conceal the true costs incurred in connection with Disney+ and improperly shift costs out of the Disney+ segment; (c)

M&ED's motive to conceal the complete costs of constructing Disney+'s content library led them to make platform distribution decisions based on factors other than consumer preference, consumer behavior, or the goal of maximizing the content's audience; (d) the Company's 2024 Disney+ global subscriber and profitability targets were not achievable and lacked a reasonable basis in fact, and, as such, Disney was not on track to achieve these targets; and (e) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

164.   The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

165.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

166.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

167.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set

forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

168. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

169. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Disney has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SECOND CAUSE OF ACTION
**Against the Individual Defendants for**
**Violations of § 14(A) of the Exchange Act and SEC Rule 14a-9**

170. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

171. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

172. The 2021 Proxy Statement and the 2022 Proxy Statement violated Section 14(a) and Rule 14a-9 because they solicited Disney stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and/or failing

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

to disclose the Company's shortcomings in connection with the Company's D2C segment.

173.   The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions as officers and/or directors of the Company and roles in the process and in the preparation of the 2021 Proxy Statement and the 2022 Proxy Statement, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2021 Proxy Statement and the 2022 Proxy Statement.

174.   The Individual Defendants knew that the statements contained in the 2021 Proxy Statement and the 2022 Proxy Statement were materially false and misleading.

175.   The omissions and false and misleading statements in the 2021 Proxy Statement and the 2022 Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2021 Proxy Statement and the 2022 Proxy Statement and in other information reasonably available to stockholders.

176.   As a direct and proximate result of the dissemination of the false and misleading 2021 Proxy Statement and 2022 Proxy Statement that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, Nominal Defendant Disney suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**Against the Securities Class Action Defendants for
Contribution under Sections 10(b) and 21D of the Exchange Act**

177.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

178.   Disney along with the Securities Class Action Defendants (Chapek, Daniel, and McCarthy) are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or directors of Disney.

179.   Because of their positions of control and authority as officers and/or directors of Disney, the Securities Class Action Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Disney, including the wrongful acts complained of herein and in the Securities Class Action.

180.   Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), which creates an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

181.   As such, Disney is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**FOURTH CAUSE OF ACTION**
**Against the Individual Defendants for Waste of Corporate Assets**

182.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

183.   As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend legal actions (evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

184.   In addition, the Individual Defendants caused the Company to repurchase hundreds of thousands of shares of Disney common stock at artificially inflated prices during the Relevant Period.

185.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

186.   Plaintiff on behalf of Disney has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**Against all the Individual Defendants for Aiding and Abetting**

187.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

188.   Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to Disney and has participated in a conspiracy in breach of fiduciary duties.

189.   In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct. The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to pursuing the wrongful

conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

190.   The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its shareholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

191.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

192.   Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

193.   Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## SIXTH CAUSE OF ACTION
### Against the Insider Selling Defendants for
### Insider Selling and Misappropriation of Information

194.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

195.  At the time of their stock sales set forth herein, the Insider Selling Defendants (Chapek and McCarthy) knew of the information described above and sold Disney common stock on the basis of such information.

196.  The information described above was proprietary non-public information concerning the Company. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Disney common stock.

197.  The Insider Selling Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

198.  Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants obtained thereby.

## SEVENTH CAUSE OF ACTION
### Against the Individual Defendants for Unjust Enrichment

199.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200.  By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Disney.

201.  The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Disney that was tied to the performance or artificially inflated valuation of Disney, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

202.  Plaintiff, as a shareholder and representative of Disney, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

203.  Plaintiff on behalf of Disney has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.  Declaring that Plaintiff may maintain this derivative action on behalf of Disney and that Plaintiff is a proper and adequate representative of the Company;

B.  Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.  Awarding prejudgment interest to the Company;

D.  Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

E.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.  Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  December 15, 2023                    Respectfully submitted,

BRAGAR EAGEL & SQUIRE, P.C.

*/s/ Melissa A. Fortunato*
Melissa A. Fortunato (SBN 319767)
   fortunato@bespc.com
Marion C. Passmore (SBN 228474)
   passmore@bespc.com
445 S. Figueroa Street, Suite 3100
Los Angeles, CA 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Audrey McAdams, hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of The Walt Disney Company common stock at all relevant times.

Executed this 8th day of December, 2023.

_Audrey McAdams_
Audrey McAdams (Dec 8, 2023 14:37 CST)
Audrey McAdams